FILED
2017 Apr-11  PM 05:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **JESSICA D. STRONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:16-cv-01800-LSC** |
| | ) | |
| **ANGIODYNAMICS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Jessica D. Strong, and pursuant to Rule 15 of the *Federal Rules of Civil Procedure*, and this Court's Order on April 4, 2017 (Docs. 26-27), hereby files this First Amended Complaint to include pertinent factual information and the causes of action that survived Defendant's Motion to Dismiss (Docs. 10-11). In support of this First Amended Complaint, Plaintiff states as follows:

## PARTIES

1.     Plaintiff Jessica Strong ("Plaintiff" or "Jessica") is an Alabama resident, citizen of Jefferson County, Alabama, and over the age of 19 years.

2.     Defendant AngioDynamics, Inc. ("Defendant" or "AngioDynamics") is a Delaware Corporation with its principal place of business in Albany County, New York.

## JURISDICTION

3.     Plaintiff invokes jurisdiction of this Court pursuant to 28 U.S.C. Sections 1331 and 1343, and 42 U.S.C. Sections 1981a, 1983, and 2000e, *et seq.* This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sections 2000e, *et seq.* ("Title VII").

4.     Within 180 days of the last discriminatory act of which Plaintiff complains, Plaintiff filed a Charge of Retaliation and Discrimination with the Equal Employment Opportunity Commission ("EEOC") against her former employer, Defendant. *See* Ex. A, Pl.'s Charge of Discrimination.

5.     On April 7, 2015, approximately one month after Plaintiff filed her Charge with the EEOC, Plaintiff's Counsel was notified that Plaintiff's Charge had been assigned to Robin Scott, an EEOC representative, who was to further the EEOC's investigation for purposes of facilitating mediation and/or settlement. *See* Ex. B, EEOC Rep. Robin Scott's Letter to Pl.'s Counsel.

6.     Plaintiff initially agreed to pursue this course of action; however, Plaintiff later determined that it would be in her best interest for her to pursue her own legal remedies.

7.     Accordingly, on January 7, 2016, Plaintiff's Counsel emailed Ms. Scott and requested a right-to-sue letter for Plaintiff's claims.  *See generally* Ex. C, Pl.'s Counsel's Aff.

8.    By mid- February 2016, neither Plaintiff nor Plaintiff's Counsel had received the right-to-sue letter from the EEOC, so Plaintiff's Counsel emailed Ms. Scott to ascertain the status of the letter. Ex. C.

9.    Ms. Scott emailed Plaintiff's Counsel on February 16, 2016, stating that "the file was submitted to management for further processing on January 7, 2016," and that Plaintiff's Counsel should contact another EEOC representative, Eless Brown. *See* Ex. C ¶ 10.

10.    Plaintiff's Counsel immediately emailed and called Ms. Brown regarding the right-to-sue letter, but she too failed to answer. Plaintiff's Counsel continued to leave emails and voicemails for Ms. Brown over the course of the next several months until Ms. Brown finally sent Plaintiff's Counsel an email on August 8, 2016. *See* Ex. C ¶¶ 11-14.

11.    In that August 8-email, Ms. Brown claimed that "the . . . charge was closed and the requested NRT was issued in January 2016." Ex. C ¶ 15.

12.    Plaintiff's Counsel replied back a minute after Ms. Brown's email was received, requesting more information and explaining that Plaintiff's Counsel had not received anything with respect to the right-to-sue letter. Ex. C ¶ 16.  Moreover, Plaintiff's Counsel made additional inquiries to Ms. Brown regarding the January 2016-letter.

13.     Frustrated with the lack of response, Plaintiff's Counsel also wrote a letter to the EEOC's Birmingham District Director, Delner Franklin-Thompson, detailing the timeline of events detailed above.

14.     By late 2016, Plaintiff and Plaintiff's Counsel had still not received the right-to-sue letter. *See* Doc. 1 at ¶ 14. Nevertheless, in accordance with Eleventh Circuit precedent, because Plaintiff assumed significant responsibility in obtaining an orderly and expeditious resolution to her claims, this Court nonetheless properly exercised jurisdiction over Plaintiff's Title VII Retaliation and Discrimination Charge, as Plaintiff originally filed this action within 90 days of August 8th date Plaintiff's Counsel received *notice* that the right-to-sue letter was purportedly sent. *See* Doc. 1 at ¶¶ 14-15; *see also Page v. Postmaster Gen. of the U.S.  Postal Serv.*, 493 Fed. Appx. 994, 996-98 (11th Cir. 2012); *Stallworth v. Wells Fargo Armored Servs. Corp.*, 936 F.2d 522, 524-25 (11th Cir. 1991).

15.     Several months after Plaintiff filed this action, the aforementioned EEOC Birmingham District Director, Ms. Franklin-Thompson, replied in response to Plaintiff's Counsel's repeated inquiries into Plaintiff's case. *See* Ex. D, EEOC Dir. Letter Feb. 10, 2017. In her letter, Ms. Franklin-Thompson explained that while the EEOC's computer system had indicated the right-to-sue letter had been mailed, "the actual charge file presented otherwise." *See* Ex. D.

16.     As a result, Plaintiff finally received her right-to-sue letter on February 10, 2017. *See* Ex. D. Thus, as Plaintiff filed her original Complaint within 90 days of being given notice that her right-to-sue letter had (allegedly) been sent, and this First Amended Complaint was filed within 90 days of the EEOC *actually* dispatching her right-to-sue letter, this Court still has jurisdiction over Plaintiff's claims.

## VENUE

17.     This action properly lies in the Northern District, Southern Division, of the United States District Court of Alabama, pursuant to 28 U.S.C. § 1391(b), because the claim arose in this judicial district and division, and pursuant to 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices were committed in this judicial district.

## FACTS

18.     On September 9, 2013, AngioDynamics, a company that designs, manufactures, and sells various medical, surgical, and diagnostic devices used by professional healthcare providers in treating patients, hired Jessica to serve as AngioDynamics' principal sales representative in Alabama and northern Florida.

19.     Jessica was highly qualified for the position having spent the previous eight (8) years in medical sales, and the three (3) years prior to that as a registered nurse.

20.     As a new employee, Jessica was given a six (6)-month "grace period," during which time her unit and revenue sales quotas were lower so as to allow her time to get acclimated to the company and her territory.

21.     A few weeks after her start date on September 9, Jessica received a lead that indicated a physician, Dr. Safwan Jaalouk, who was a cardiologist with Baptist Health Care in Pensacola, Florida, was interested in purchasing AngioVac – a product Jessica sold – for his group's practice.

22.     Pursuant to the new lead, Jessica called and/or emailed representatives at Dr. Jaalouk's hospital to set up a meeting discuss his and his practice's interest in AngioVac. A meeting was scheduled for some time in or around November of 2014.

23.     At this meeting, Dr. Jaalouk seemed very interested in AngioVac and wanted the other members of his practice to learn about the product before a decision was made regarding a purchase. Jessica explained that the most common way educate physicians about AngioVac was through an informatory dinner organized by AngioDynamics. Dr. Jaalouk was receptive to the idea, and he and Jessica planned for the event to be held in January of 2015 in Pensacola.

24.     The dinner was very successful. Jessica, her manager, Holly Koufos, and the inventor of AngioVac were in attendance on behalf of AngioDynamics. In addition, Dr. Jaalouk and twenty or more members of his practice were present to learn about the product. Dr. Jaalouk claimed that his colleagues enjoyed the dinner

and the presentation, and that they would further discuss whether they wanted to purchase AngioVac.

25.     In the weeks and months following the dinner, Jessica communicated with Dr. Jaalouk concerning the progress of the potential AngioVac sale. These communications included several phone calls, emails, and text messages, along with two informal meetings in Pensacola. Jessica's correspondence and personal interactions with Dr. Jaalouk were – at all times – professional and principally concentrated on fostering a business relationship.

26.     Around this same time, Jessica learned that other doctors were meeting in March of 2015 to consider, among other things, AngioVac.

27.     After learning of this meeting, Jessica contacted Dr. Jaalouk to see if he could meet with her in order to review answers to anticipated misgivings that would likely be raised by other physicians at the meeting in March. Ultimately, Jessica and Dr. Jaalouk agreed to do this over dinner in Pensacola the night before the meeting on March 20.

28.     The day before Jessica and Dr. Jaalouk were scheduled to have dinner to talk about the upcoming meeting, however, Dr. Jaalouk sent a sexually suggestive text message to Jessica after he asked her when she would be getting into town. Jessica told him that she would arrive around 3, but could get there earlier if needed. Dr. Jaalouk replied: "Super flexible girl. I like it lol[.]"

29.     This text message made Jessica feel uneasy, but because she did not want to lose the potential business, she decided not respond and still proceed with the dinner plans.

30.     At dinner, Dr. Jaalouk made a number of inappropriate comments, which made Jessica increasingly more uncomfortable. Despite these comments, Jessica did her best to keep the conversation centered on AngioVac.

31.     Following dinner, as Jessica and Dr. Jaalouk were walking to their respective cars to leave, Dr. Jaalouk – without ever receiving any indication from Jessica that it was appropriate – tried to kiss Jessica. Jessica pushed him away and explained to him that their relationship was strictly professional. Dr. Jaalouk acknowledged that such conduct was inappropriate.

32.     Jessica, in an attempt not to compromise the possible sale, did not report anything to her manager, or any other AngioDynamics official, at this point in time.

33.     Instead, she maintained a "business as usual" approach while dealing with Dr. Jaalouk.  To that end, Jessica continued her practice of contacting Dr. Jaalouk every three or so weeks via email or text to monitor the sale's progress. This method and form of communication remained the same until June of 2014 when Dr. Jaalouk stopped answering Jessica's text messages.

34.     One day, on July 22, 2014, Jessica was at Dr. Jaalouk's hospital working on some of her other cases when she happened to run into him. Jessica

asked him if they could meet later that day to see if he and his colleagues were close to a decision. Dr. Jaalouk told her that would be fine.

35.    A few hours later, Dr. Jaalouk – quite unexpectedly – told Jessica to not text him again.

36.    Surprised by his response, Jessica wrote Dr. Jaalouk an email expressing her disbelief at what appeared to be his anger with her when he was the one who had acted inappropriately. Additionally, Jessica told Dr. Jaalouk that she would no longer do business with him, and that if he wanted AngioVac at his hospital, she would arrange for another AngioDynamics representative to assist him.

37.    The following day, on July 24, Jessica's manager, Holly Koufos, asked Jessica about the AngioVac sale to Dr. Jaalouk and his practice. Jessica explained the current situation, including the sexual harassment she suffered, and forwarded Koufos the email she had sent to Dr. Jaalouk.

38.    Nothing was said about the email or Dr. Jaalouk for a few weeks, and Jessica pursued other sales.

39.    However, on August 18, 2014, Koufos called Jessica to tell her that the email she sent to Dr. Jaalouk had been seen by human resources ("HR"), that they wanted to talk to her, and that "it [was] serious." Koufos also told Jessica that if she were in Jessica's position, she would resign.

40.     Jessica found AngioDynamics' response to her email to Dr. Jaalouk contrary to its policies in her employee handbook.   Upon employment, Jessica was given an employee handbook that contained AngioDynamics' harassment policy, which strictly prohibited it by any person, employee or customer, associated with AngioDynamics.

41.     The employee handbook set forth two ways by which an individual who believed that he or she was a victim of harassment to report such conduct:

> Individuals who believe they have experienced conduct that is contrary to AngioDynamics policy or who have concerns about such matters *may first notify the offender that his/her behavior is unwelcome* and request that it cease immediately. If an offender does not stop his or her behavior or if you are uncomfortable confronting the offender, you should report the situation to your Manager.

(emphasis added).

42.     Knowing that she had the right to confront her offender, Jessica was perplexed by Koufos' statement that she (Jessica) should resign.

43.     When Jessica spoke with AngioDynamics' HR representative, Moira Fitzgerald, Jessica recounted the entire ordeal to her. Jessica detailed all of the aforementioned pertinent events, explained that she had recently apologized to Dr. Jaalouk even after he sexually harassed her, and ensured Ms. Fitzgerald that everything was fine with regard to her relationship with Dr. Jaalouk and the potential sale.

44.     Later, on August 28, 2014, Ms. Fitzgerald sent Jessica a summary of their conversation via email for Jessica to review and edit. This summary contained numerous falsities, and failed to mention several important things Jessica said. Complicating matters even further, in the same email, Ms. Fitzgerald demanded that Jessica respond that same day if she wanted her edits to be taken into account; yet, when the email was sent, Jessica was travelling to another sales meeting.

45.     Jessica was unable to meet the unreasonable deadline, but sent Fitzgerald extensive edits to the summary not long after.

46.     Notwithstanding Jessica's apology, assurance to HR that everything was "fine," and meaningful edits to Ms. Fitzgerald's summary, AngioDynamics issued Jessica a Written Counseling Warning on September 3, 2014 – only weeks after she disclosed the sexual harassment she suffered at the hands of a potential client.  Clearly, this Warning was causally related to Jessica's reporting of Dr. Jaalouk's sexual harassment.

47.     Furthermore, the Written Counseling Warning falsely accused Jessica of poor performance, persistent excessive tardiness, non-professionalism, and a bad attitude. These allegations ran counter to the feedback she received in her Performance Review for 2014 and from her superiors, who lauded her for her proactivity and potential for success.

48.     Additionally, and most importantly, the Written Counseling Warning unreasonably required Jessica to make four (4) AngioVac sales and obtain at least "90% to quota YTD" within the next *60 days*, as well submit weekly call reports every Monday, or face *termination*.

49.     The very nature of medical sales inherently involves expensive and sophisticated products, which, due to their considerable expense and importance, often requires a great deal of consideration and time on the part of the purchaser. Accordingly, medical sales representatives must expend substantial effort with a potential purchaser to effectuate even a single sale.

50.     An individual AngioVac unit costs $13,000, and the time it takes to sell just one of them is usually more than 60 days. Therefore, to require Jessica to sell not one, but four (4) of them *and* 90% of her quota to date over the course of  60 days was virtually impossible; especially in light of the fact that Jessica had not been working for AngioDynamics a full year at that point in time.

51.     As such, AngioDynamics's sales and revenue mandates effectively constituted retaliation and a hostile work environment; they were patently unattainable benchmarks that guaranteed Jessica's termination. And indeed, after suffering through a stressful and demanding two months while the Warning was in place, Jessica was officially terminated on November 10, 2014 when she did not reach AngioDynamics's impervious goals.

## COUNT I –TITLE VII
## HOSTILE WORK ENVIRONMENT

52.    Plaintiff adopts and re-alleges all of the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

53.    Defendant subjected Plaintiff to harassment on account of her sex which created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991.

54.    Plaintiff told Defendant about (1) the unwelcomed harassment she suffered because of the actions of a potential client, and (2) how Plaintiff confronted the harasser. Yet, instead of protecting Plaintiff and doing something to punish/correct the potential client's harassment, Defendant condoned the potential client's behavior and disciplined Plaintiff because of her disclosures.

55.    The actions Defendant undertook as a result of Plaintiff's protected activities fostered a hostile work environment that was so outrageous and pervasive that it affected the terms and conditions of Plaintiff's employment, and ultimately led to her dismissal.

56.    In addition, Defendant subjects female employees to different and discriminatory terms and conditions of employment, and Defendant has a habit and/or practice of discriminating against women and/or allowing or condoning the sexual harassment of female employees, thereby cultivating a hostile work environment.

57.     Due to Defendant's wrongful conduct, Plaintiff suffered and will continue to suffer damages to her professional life and future career opportunities, loss of pay and benefits, past and future pecuniary losses, embarrassment, emotional pain, physical pain, inconvenience, mental anguish, and non-pecuniary damages.

## COUNT II: RETALIATION

58.     Plaintiff adopts and re-alleges all of the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

59.     Plaintiff was sexually harassed by Defendant's potential client while she was acting within the scope of her employment.

60.     Plaintiff opposed the harassment pursuant to her employee handbook by confronting her offender and notifying her supervisor.

61.     With full knowledge of these violations of Title VII of the Civil Rights Act of 1964, as amended, Defendant maliciously and recklessly subjected Plaintiff to adverse employment actions because Plaintiff engaged in statutorily protected activity.

62.     Due to Defendant's wrongful conduct, Plaintiff suffered and will continue to suffer damages to her professional life and future career opportunities, loss of pay and benefits, past and future pecuniary losses, embarrassment, emotional pain, physical pain, inconvenience, mental anguish, and non-pecuniary damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, **PREMISES CONSIDERED**, Plaintiff respectfully requests that this Court assume jurisdiction of this action, grant a trial by struck jury of the Plaintiff's claims, and after such trial, grant/award Plaintiff the following forms of relief:

1.    A declaratory judgment that states the employment practices of the Defendant are violative of the rights of the Plaintiff as secured by Title VII.

2.    A permanent injunction enjoining Defendant, its agents, successors, employees, attorneys, and those acting in concert with Defendant and at Defendant's request from continuing to violate Title VII.

3.    An order requiring Defendant to make Plaintiff whole by awarding her front-pay, back pay (plus interest), liquidated, compensatory, punitive damages and/or nominal damages, injunctive and declaratory relief, and benefits.

4.    Attorney's fees and costs.

5.    Any such other relief as the Court deems just and proper.

**JURY DEMAND**

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS.**

Respectfully submitted,

*/s/ Andrew P. Campbell*
Andrew P. Campbell
Attorneys for Plaintiff

15

**OF COUNSEL:**
Andrew P. Campbell
Yawanna McDonald
Asher Kitchings
CAMPBELL GUIN, LLC
505 20th Street North, Suite 1600
Birmingham, AL 35203
Telephone: (205) 224-0756
andy.campbell@campbellguin.com
yawanna.mcdonald@campbellguin.com
asher.kitchings@campbellguin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of April, 2017, I electronically filed the

foregoing using the EFile system, which will automatically send notification of such

filing to the following:

Stephanie H. Mays
Allen B. "Josh" Bennett
MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, Alabama 35203-2618
(205) 254-1000
smays@maynardcooper.com
jbennett@maynardcooper.com

Michael D. Billok
Robert F. Manfredo
BOND, SCHOENECK & KING, PLLC
22 Corporate Woods Blvd., Suite 501
Albany, New York 12211
(518) 533-3214
billokm@bsk.com
rmanfredo@bsk.com

*Attorneys for Defendants*

/s/ Andrew P. Campbell
Of Counsel